FREDERICK SONNENSCHEIN ET AL. V. CHARLES BAR-
TELS ET AL.

FILED SEPTEMBER 20, 1893.    No. 4676.

1. **Fraudulent Conveyances:** EVIDENCE. Direct proof of fraud
can seldom be obtained, nor is such evidence absolutely essential
to establish the fraudulent purpose of the parties to a pretended
transfer of property; but such fraudulent purpose may be shown
by the conduct of the parties, the details of the transaction, and
all the surrounding circumstances.

2. ——: ——. The evidence in the present case examined, and
*held* to be sufficient to sustain a finding that an alleged transfer
of a stock of goods was made for the purpose of hindering, de-
laying, and defrauding creditors.

3. **Sufficiency of Evidence to Sustain Verdict:** REVIEW.
When a jury has decided a question of fact properly submitted,
and the trial judge has overruled a motion for a new trial, then,
if the record discloses competent evidence on which the finding
may have been based, such finding cannot be disturbed by the
supreme court.

4. **Fraudulent Conveyances:** CONVERSION: ACTION AGAINST
SHERIFF: JUSTIFICATION: EVIDENCE. Where a suit in attach-
ment was brought against a vendor of a stock of goods on the
ground that the sale was fraudulently made to defeat creditors,
a sheriff seized the goods, judgment was rendered sustaining the
attachment, and ordering the goods sold. *Held,* That the record
of said attachment proceedings, the same being in force, was
competent evidence on behalf of the sheriff in a suit brought
against him for the unlawful conversion of said stock of goods,
in which suit he pleaded justification under said attachment
proceedings, and that the sale to plaintiffs with their knowledge
was fraudulently made to defeat the creditors of their vendors.

ERROR from the district court of Douglas county. Tried
below before DOANE, J.

*J. C. Crawford* and *Cowin & McHugh,* for plaintiffs in
error.

*T. M. Franse* and *M. McLaughlin,* contra.

RAGAN, C.

About June 30, 1888, the defendant Charles Bartels was the owner of a stock of merchandise situate at West Point, in Cuming county, Nebraska, and on this date sold it to Brazda Bros., of the same place, at the invoice price of $11,300. Of this sum, Brazda Bros. paid Bartels, at the time of the sale, $3,000 cash, and gave their promissory notes for $8,300, secured by the personal signatures of their friends living in said Cuming county. On Saturday, March 2, 1889, Brazda Bros. made an alleged sale and delivery of this stock of goods to the plaintiffs in error, for the alleged consideration of $3,200 in cash, and some lands in Boone and Keya Paha counties, and some lots in in the city of Omaha. The balance of the purchase price of the goods sold to Brazda Bros. remained, at this time, unpaid to Bartels. On Monday, March 4, there were filed in the recorder's office of Cuming county mortgages made by the sureties on Brazda Bros.' notes, conveying and incumbering most, if not all, of the property of said sureties. A suit was brought by Bartels against the Brazda Bros. and the sureties who had signed their notes, on the alleged ground that the sale of the stock of goods from Brazda Bros. to the plaintiffs in error, and the mortgages made by said sureties of their property, were all fraudulent and made for the purpose of hindering, delaying, and defrauding Bartels in the collection of his debt against Brazda Bros. An attachment was issued in said action, by virtue of which the sheriff of Cuming county seized the said stock of goods. Motions to discharge the attachment were overruled, judgments rendered against the Brazda Bros. and sustaining the attachment and ordering the goods sold, and the proceeds applied on the judgment; all of which was done. Plaintiffs in error then brought this suit against Bartels, Sharpe, the sheriff of Cuming county, Mr. Franse and Mr. McLaughlin, Bartels' attorneys, alleging that they

41

had unlawfully and wrongfully converted to their own use the said stock of goods, they then and there being the property of the plaintiffs in error.

The answer of the defendants, so far as material here, consisted: (1) Of a general denial; (2) that the sale of the goods by Brazda Bros. to the plaintiffs in error was fraudulent and made with the intent and for the purpose, on the part of both vendors and vendees, to hinder, delay, and defraud the creditors of the said Brazda Bros.; (3) that the defendants took the stock of goods under the writ of attachment in a suit brought in the district court of Cuming county by Bartels against Brazda Bros. and the said sureties on their notes.

There was a trial to a jury with a verdict and judgment for the defendants in error.

The principal point litigated on the trial in the district court was, whether the sale of the stock of goods made by Brazda Bros. to plaintiffs in error was fraudulent. The jury, by its verdict, said it was, and the first error alleged here is, that there was no evidence before the jury to support this finding. Let us see. The jury had before it evidence that Bartels and plaintiffs in error lived in the same town; were neighbors on good terms; intimately acquainted and saw each other often; that plaintiffs in error were engaged "in the real estate, loan, and mercantile brokerage business;" that plaintiffs in error negotiated or took part in negotiating the sale of the stock of goods in June, 1888, from Bartels to Brazda Bros.; that the plaintiffs in error knew at the time that Brazda Bros. gave their notes for the larger part of the purchase price, which notes were secured by the personal signatures of some men in Cuming county; that the plaintiffs in error knew on March 2, 1889, when they claimed to have purchased these goods of Brazda Bros., that Bartels' notes were unpaid; that the plaintiffs in error knew at said time that Brazda Bros. were otherwise largely indebted and in financial straits; that this sale

was made without an invoice; that it was made on a Saturday night after the close of business; that it was made secretly, the employes in the store, when they left at 8 or 9 o'clock in the evening, suspecting no change; that Bartels was in the store during the day and just before it closed in the evening, but he was not advised of the sale; that it was not made in the usual course of mercantile business; that the plaintiffs in error were not then engaged, nor did they intend to engage, in mercantile pursuits; that the consideration paid by the plaintiffs in error for said stock of goods, except $3,200 in cash, consisted of some lands in Boone and Keya Paha counties, of a poor quality, and incumbered by mortgages to about their value, and some lots in the city of Omaha, also incumbered to about the extent of their value; that the consideration paid for said goods was disproportionate to their value; that the plaintiffs in error, on Monday morning, March 4, advertised to sell, and did sell, many of the goods at and below cost; that between the closing of business hours on Saturday night, March 2, and Monday morning, March 4, a large amount of silk goods was removed from the stock; that as early as 8 or 9 o'clock on Monday morning, March 4, following the alleged sale conveyances from the sureties on Bartels' notes of their property were placed on file in the register's office in said Cuming county; that these sureties lived, at the time, from twelve to twenty miles from West Point, where the mortgages were executed, and that there was no railway communication between West Point and the homes of said sureties. This is a synopsis of some of the evidence tending to show that the sale from Brazda Bros. to plaintiffs in error was fraudulent.

On the other hand there was evidence that negotiations for the sale of this stock had been pending for some two weeks between Brazda Bros. and plaintiffs in error and other parties, among them one "Father Resing;" that the cash paid Brazda Bros. by plaintiffs in error was applied

on a debt due from Brazda Bros. to a bank in West Point;
that the sale was made in the afternoon of Saturday; that
the value of the lots and lands traded for the stock, added
to the cash paid, equaled or exceeded the value of the
goods; that the plaintiffs in error, at the time of their pur-
chase, had no knowledge of Brazda Bros.' indebtedness ex-
cepting the debts to Bartels and the bank; that the most of
Bartels' unpaid notes were not due at the time of the sale;
that the plaintiffs in error had traded lands and money for
mercantile stocks before; that Bartels congratulated the
plaintiffs in error, on Monday morning, over their purchase,
rented them his store room for sixty days, and induced them
to hire his son as a clerk. This is a synopsis of some of the
evidence tending to show the good faith of the sale from
Brazda Bros. to the plaintiffs in error.

Of course almost everything testified to by one side was
denied by the other. There is in the case a continual con-
flict. The case was vehemently and persistently tried on
both sides by eminent counsel, and from the record before
us it appears, as is usual in such cases, one party claimed
that everything done was "as pure as the snow on Diana's
lap," while the other indicted the transaction "a fraud that
smelled to heaven." Whatever may be the truth, one
thing is certain : that the only tribunal designated by the
laws of this country to hear, deliberate upon, and decide
such a dispute as the one in this record is the one that did
decide it, a jury. Not only did twelve jurymen hear this
evidence, but a learned, upright, and impartial judge pre-
sided at this inquiry. He also heard the witnesses, ob-
served their demeanor on the stand, and to him, first, the
plaintiffs in error alleged, in their motion for a new trial,
the error we are now considering. Had he been of the
opinion that this verdict was unsupported by the evidence,
or contrary to the weight thereof, he was invested by law
with the discretion and authority to set it aside. He was
evidently not of that opinion, for he refused to disturb

the finding of the jury. Here, then, are the judgments of thirteen men as to the weight of this evidence, men who heard and saw the witnesses. It was the special privilege as well as the duty of at least twelve of these men to weigh this evidence and to scrutinize it. This court cannot weigh evidence in a case like this. For it to do so, would be doing violence to the spirit if not the letter of our laws. The laws and constitutions of nearly all civilizations of the nineteenth century forbid the trial and determination of questions of fact by judges. When a jury has decided a disputed question of fact, and the trial judge has said by his ruling it was rightly decided, then, if the record discloses any competent evidence on which the finding may have been based, it cannot be disturbed by the supreme court, as it has no authority to scrutinize or weigh evidence in such cases. We agree with the trial court that the verdict of the jury was supported by the evidence.

On the trial the defendants put in evidence the proceedings in the attachment suit of Bartels against Brazda Bros. and their sureties, and the deeds and mortgages made by the sureties on Monday, March 4, 1889. This is the second error alleged.

One of the defenses of the defendants was that the goods sued for in this action were, in fact, the property of Brazda' Bros., and were taken by the defendants in the attachment suit of Bartels against Brazda Bros. In short, this defense was a justification. The attachment proceedings were a part of the defendants' case and competent evidence. The judgment of the court sustaining the attachments proved the fraud pleaded by the defendants so far as Brazda Bros. were concerned; and the defendants were also entitled to this evidence, because it negatived the probable inference that might have arisen in the minds of the jury, if the evidence had been excluded, that the sheriff and the other defendants were malicious trespassers.

As to the mortgages and deeds made by the sureties of

Brazda Bros., the theory of the defendants was that the making of these deeds and mortgages on Sunday or Monday following the alleged sale on Saturday night was a part of one transaction or conspiracy participated in by the plaintiffs in error and Brazda Bros. to defraud Bartels. That these conveyances were made by these sureties to defraud Bartels, no one we think, who reads this evidence, can doubt. These sureties lived from twelve to twenty miles from the place where the sale of goods occurred. The record does not show that they were in town on the day of the alleged sale, and they had no railway communication with the town. There was evidence which tended to show that this alleged sale was made late on Saturday night. On Monday morning, as early as 8 o'clock, some of these sureties filed for record conveyances of their property. They must have been advised of the sale during Sunday. There was evidence—and whether true or false was for the jury to decide—which tended to show that the sale from Brazda Bros. to the plaintiffs in error was not made in good faith either on the part of Brazda Bros. or the plaintiffs in error. Under these circumstances we cannot say that the trial court erred in admitting in evidence these conveyances. They were so intimately connected and interwoven with the acts of the parties to the sale of the goods, and followed so closely upon that transaction, as to be *prima facie* a part of it. Fraud may be proved by circumstances (*Strauss v. Kranert*, 56 Ill., 254), and. in some cases can only be so proved.

The next error assigned is the giving by the court, on its own motion, of instruction No. 6. It is as follows: "It is not necessary that the testimony should show actual knowledge by the parties of the fraudulent purposes of Brazda Bros. in making the sale of their stock; but if the testimony shows the existence of such facts and circumstances as would have led a man of ordinary sagacity and prudence to the knowledge of the purposes with which

Brazda Bros. disposed of their stock, then you will be justified in finding that the parties had such knowledge of the fraudulent purposes of Brazda Bros."

Plaintiffs in error say that the instruction was erroneous for the reason "that there is no testimony tending to show that Brazda Bros. disposed of their stock of goods with intent to defraud their creditors, much less that plaintiffs in error knew of such fraudulent intention, if it existed." We think that there was evidence which tended to show that the sale from Brazda Bros. to the plaintiffs in error was made with the intention on the part of both vendors and vendees to hinder and delay the creditors of Brazda Bros. There was no error in the giving of this instruction.

It it also alleged that the court erred in giving instructions 1 to 8, both inclusive, asked by the defendants in error. And this error is based on the contention of the plaintiffs in error that the instructions were not applicable to the evidence in the case. We have stated above the synopsis of the testimony bearing upon the good faith of the sale made by Brazda Bros. to plaintiffs in error. The instructions complained of as not applicable to this evidence are as follows:

"1. If you find from the evidence that the plaintiffs in this case acquired their alleged title to the goods in controversy by purchase from Brazda Bros.; and if you further find that the Brazda Bros., in making such sale to the plaintiffs, intended thereby to hinder, delay, and defraud their creditors, and that the plaintiffs in purchasing the same participated in, or knew, or had notice of, such fraudulent intent on the part of said Brazda Bros., before or at the time they made such purchase, then you will be authorized to find that the plaintiffs acquired no title to said goods as against the creditors of Brazda Bros.

"2. An actual agreement or conspiracy between the Brazda Bros. and the plaintiffs, that the latter would aid

the former to defraud their creditors, does not have to be shown. It is sufficient to avoid the sale if the facts and circumstances within the knowledge of the plaintiffs are such as fairly induce the belief that they either knew of the fraudulent purpose of the Brazda Bros., or, having good reason to suspect it, they purposely refused to make inquiry and remained willfully ignorant.

"3. The court instructs the jury that fraud in the sale or conveyance of property is a fact that may be proved by showing the existence of other facts and circumstances surrounding or connected with the transaction tending to show a fraudulent intent on the part of the parties to such sale or conveyance, or tending to show a purpose not consistent with an honest intent, and if the jury believe, from the evidence in this case, as shown by the proof of facts and circumstances, that Brazda Bros. intended by the sale of the property in controversy in this action to hinder, delay, and defraud their creditors, and that the plaintiffs, in purchasing the same, participated in, or knew, or had notice of, such fraudulent intent on the part of Brazda Bros. before or at the time they made such purchase, then in such case the defendants are entitled to recover in this action.

"4. The court instructs the jury that if they believe Brazda Bros. sold and conveyed the property in controversy to the plaintiffs, and they further believe from the evidence that Brazda Bros. intended by such sale to hinder, delay, and defraud their creditors, and that before or at the time the plaintiffs made such purchase they had knowledge or notice of such fraudulent purpose of Brazda Bros., or before or at the time of such purchase the plaintiffs had knowledge of such facts and circumstances as would have aroused the suspicion of and put a reasonably prudent man upon inquiry, which inquiry, if pursued, would have led to knowledge or notice of such fraudulent intent on the part of Brazda Bros., then, in such case, plaintiffs cannot recover in this action, and they will find for the defendants.

"5. The court instructs the jury that if they believe from the evidence that Brazda Bros. sold and conveyed to plaintiffs the property in controversy, and that in said sale it was the intent of Brazda Bros. to hinder, delay, and defraud their creditors, and that plaintiffs participated in such fraudulent purpose, or had knowledge or notice of the same before or at the time of the purchase, then and in that case plaintiffs take no title to property so purchased as against the creditors of Brazda Bros., though the jury may believe from the evidence that they paid full value therefor, and in such case the jury will find for the defendants.

"6. A full consideration paid in cash will not protect a purchaser who had notice, actual or constructive, that the vendor was selling to hinder, delay, or defraud his creditors. It is not enough that a vendee is a purchaser for value; he must be an innocent purchaser.

"7. The court instructs the jury that if they believe from the evidence that Brazda Bros. were insolvent, or were largely indebted, and that they were being pressed by creditors for payment of their respective claims, and that while so indebted they made sale of all their property to plaintiffs, and that such sale had the effect to defeat the creditors of Brazda Bros. in the collection of their debts, and that such indebtedness of Brazda Bros. was known to plaintiffs before purchasing the property, then these facts, if shown in the evidence, are circumstances to be considered by the jury as showing a fraudulent intent in the sale of such property.

"8. The court instructs the jury that fraud in the sale and conveyance of property is often difficult to detect and hard to prove, and for this reason the law permits fraudulent purpose and intent to be shown by proof of the existence of other facts and circumstances, surrounding or connected with the fraudulent act, that tend to show a dishonest purpose; and in this case, if the jury believe from the evidence that the plaintiffs were not merchants or deal-

ers in the character of goods in controversy, and that they purchased all the property in controversy from the Brazda Bros. at and for a price less than its real value; that prior to said purchase no invoice of said property had been taken whereby the quantity and value of the same could be ascertained; that at the time of such purchase Brazda Bros. were insolvent and largely indebted; that the remainder of the property of the Brazda Bros. and the separate property of Anton Brazda and Dominik Brazda, who composed said firm, were so incumbered as not to be available for the payment of their creditors; that such sale would have the effect to hinder, delay, or defeat the creditors of said Brazda Bros. in the collection of their debts; that plaintiffs knew of such indebtedness of Brazda Bros., or could have known it by ordinary inquiry; that said sale was secretly and hurriedly made and consummated in the nighttime; that immediately after the plaintiffs came into possession of said stock of goods they proceeded to advertise and sell said goods at cost and less than costs, and did sell a large amount of said goods at original costs and at less than original cost price, and continued to do so until stopped by the service of a writ of attachment upon them at suit of the defendants in this action; that the plaintiffs did not intend to sell said goods and run a mercantile business after the manner and custom of merchants, but expected to make money out of the goods by closing out the entire stock at cost and less than costs, at private sale or by auction; then these and similar facts and circumstances, if shown in evidence to the jury, are to be considered by them in determining whether the sale of the property in controversy by Brazda Bros. was fraudulent or not."

These instructions were applicable to the evidence before the jury. That they stated the law correctly, see the following authorities: *Gollober v. Martin*, 33 Kan., 252; *Strauss v. Kanert*, 56 Ill., 254; *Purkitt v. Polack*, 17 Cal., 327; *Holcombe v. Ehrmantraut*, 49 N. W. Rep. [Minn.],

Sonnenschein v. Bartels.

191; *Beels v. Flynn*, 28 Neb., 575; *Tootle v. Dunn*, 6 Id., 93; *Knower v. Gadden Clothing Co.*, 57 Conn., 202; *Bollman v. Lucas*, 22 Neb., 796; *Blum v. Simpson*, 71 Tex., 628; *Cox v. Cox*, 39 Kan., 121.

The plaintiffs in error, in their motion for a new trial, assigned, as one of the reasons therefor, misconduct of the jury and the defendants. It is here claimed that the evidence used on the hearing of the motion for a new trial "showed that some of the jurors were tampered with during the trial, being treated with whiskey and cigars by some of the defendants." We cannot agree to the conclusion deduced by the eminent counsel from the facts stated in the affidavits. We are of the opinion that these affidavits failed to show that any juryman was tampered with by any one, and they fail to show that any juryman was treated with whiskey or other drink or cigars by any of the defendants or their counsel. Nor do these affidavits show any such misconduct on the part of the defendants or any of them, or of their counsel, as would have justified the setting aside of this verdict. "Upon a motion to set aside the verdict of a jury in which questions of fact are involved, the court hearing the motion becomes the judge of such questions of fact, and his decision thereon must be final, unless clearly and manifestly wrong." (*Sang v. Beers*, 20 Neb., 365.) The judgment of the district court was right, and is in all things

AFFIRMED.

THE other commissioners concur.